Your Honors, the second case in the docket this morning is 2-24-0357. Bonnie Neubauer and Richard Neubauer, plaintiffs' appellants. We brought in H. Piercy and Piercy and Associates Ltd., defendants' appellees. Arguing on behalf of the appellants, Mr. Michael H. Shulman. Arguing on behalf of the appellees, Mr. Daniel B. Lyon. Thank you. Mr. Shulman, you may proceed. Thank you, Your Honor. Good morning. Good morning. Mr. Meyer, good morning. And Richard and Bonnie Neubauer, good morning to you two as well. This is my first time in the Illinois Appellate Court, and it's a real privilege to be here. May it please the Court. The appellants are here asking this Court to reverse vacate the order for summary judgment and direct the trial court to send this case to trial, either submitting the question of the statute of limitations, the factual basis for the statute of limitations to the jury, or for this Court to decide and determine that the defendant appellants are stopped from raising the statute of limitations as an affirmative defense. The facts in this case are fairly straightforward, both as to the merits of the case and as to the question of when did the Neubauers know or reasonably should have known that they were wrongfully injured, which is basically the language of the statute of limitations, which has been interpreted by the appellate courts to include essentially any injury, not just injury that would be caused by the specific person, but the fact of any injury. And while I would argue that that language is not actually in the statute, I do recognize and the appellants recognize that that is the law of Illinois as recognized and interpreted by the Illinois appellate courts. I would say as a postscript, however, that gives a special recognition to lawyers or a special, I would argue, protection to lawyers. And in this case, I think it's most profound and the impact is most profound. The facts are simple. The Neubauers transferred $1.4 million of their retirement monies to a man by the name of Matthew Peercy, who claimed to be an investment advisor and claimed to be able to provide investment skills and investment guarantees based on an account in which he had developed an algorithm, which he had written and was guiding the course of the investments. He was guaranteeing in writing an 8% return to the Neubauers. So they transferred also at the suggestion of their then investment advisor these monies in November of 2018 to Matthew Peercy. A month later, on December 10th, they went to meet Matthew Peercy's father, Rodney Peercy. The Neubauers needed to update their wills and trusts because, unfortunately, they had lost a child, and they needed to make sure that their estate plan took that into account in terms of distributing their assets. And at that meeting, they told Rodney Peercy that they were eager to proceed with him, in part because they had just retained his son as their investment advisor and they were optimistic that both a father and son would be able to provide good services to them both as a lawyer and as an investment advisor. What they did not know and was not disclosed to them is that approximately six months before, in July of 2018, Matthew Peercy had come home to talk to his dad and confided to him that he was under investigation by the FBI for criminal securities fraud violations. There were allegations at that point. Nothing had been proven, but there were allegations. Rodney Peercy said nothing at this December 10, 2018 meeting about his son, about his son's confession, what I am calling his confession to his father, made no reference really to him at all. Would that have been a violation of attorney-client? I mean, was Rodney acting as son's attorney? I don't believe so. Just a kitchen table conversation? No confidentiality arose? Your Honor, I believe that will be raised at trial. It has not been raised as of yet and I don't think it really has any impact on the statute of limitations argument, but I also don't want to leave you high and dry with an answer. I think there are reasons why this would not be privileged. For one thing is Rodney Peercy disclosed this fact of the confession in another case, which I was handling, and as an aside, it really demonstrates the conundrum in this case for the Neubauers to be able to know that they were wrongfully injured. There was no way except that they happened by happenstance to hire the same lawyer who was working in the other case where Rodney Peercy during a deposition in the other case said, my son came home on July 18, 2018, and told me about this investigation that was ongoing. Other than that, other than I found out about it at a deposition that I was taking, the Neubauers would have had no idea that Rodney Peercy ever knew about his son's malfeasance. There is no reason to suggest in the indictment and any proceedings against Matthew Peercy that Rodney Peercy was knowledgeable. So I believe that there was a waiver, but more important, and I'm sorry to digress, but more importantly, it really isn't before the court in terms of the statute of limitations. But it does go to the merits of the case because we believe that Rodney Peercy acted below the standard of care when he did not make that disclosure to the Neubauers, and also to the Neubauers telling them that they had a claim for rescission. When you say standard of care, are you talking about an account or a cause of action for legal malpractice? Yes, sir. As far as Rodney's concerned? That's what we have sued Rodney for, legal malpractice, acting below the standard of care, yes. He also breached his fiduciary duties. But as I understand Illinois law on this, there really isn't any difference between a claim for breach of fiduciary duties and legal malpractice. But we certainly mentioned both in count one against Rodney. We have a two-count second amended complaint where we sued Rodney and we sued his firm under respondeat superior. But clearly this is a case where we believe that his negligence was such that he had an obligation as a fiduciary to disclose to the Neubauers, number one, that they had a claim for rescission, which had a very short statute of limitations under the Illinois securities law of only six months, and also to disclose that he knew that Matthew was under this investigation. And we allege in the complaint that surely the Neubauers would have taken steps, either a rescission claim, but they would have made a demand in January, in December, really, of 2018, to Matthew to return the monies they had just weeks ago, less than a month ago, distributed to him, transferred to him, if they had known that he was in fact under investigation. And if he had said, no, I'm not giving you your money back, they would have had ample time to file a claim for rescission. And they would have, arguably, in our complaint, they would have done so. Obviously these are facts which we have to prove at a trial, and we would have to persuade a jury that that's in fact what the Neubauers would have done. But the facts here that are dependent and determinative by the trial court were really Mr. Neubauer's testimony on two words, charade and scam. And that is the basis, basically, for which the court found that the Neubauers knew, or reasonably should have known, that they were wrongfully injured. I would, with the court's permission, like to read to you what Mr. Neubauer said immediately after answering Mr. Myers' question, that he felt he was the subject of a scam and a charade. I summarized that in my briefs, but I really, in hindsight, think I probably should have documented it with the literal words of Mr. Neubauer, because I think it's very important. What was the proximate cause of your client's damages? The proximate cause was that if he had known that the failure to disclose and the failure to advise prevented them from recovering the $1.4 million that they had just recently transferred to Matthew Piercy. This case is not about them suing Matthew Piercy. It's not even about Matthew Piercy's whether he is a fraudster or not. He is still in prison, but the fact of the matter is this is a case against a lawyer who has knowledge of an event that is critical in his giving advice to his clients. They came in and made a list of all their assets, and they showed him a statement from Family Wealth Legacy, which was the organization that Matthew Piercy owned and ran, that showed the investments that they had just transferred to him. So Rodney Piercy, having been at one time a co-owner of Family Wealth Legacy, surely would have recognized that this investment, that the Neubauers needed to take steps to protect them in their investments. And you allege in the Second Amendment complaint that had he done that, they would have had a shot at getting back. I think it's also alleged in the Second Amendment that at that moment or at that time, money was still coming into the fund managed by the son, and so therefore it would have been Ponzi-like, but they might have been able to get something or more than they otherwise would have got. Yes. Had he given the alarm. Yes, and there are facts which vindicate that, which support that. Richard Neubauer testified that in August of 2019, just months before the date which the court fastened on to trigger the statute of limitations, he received a distribution from Matthew Piercy of $250,000 when he had only requested $30,000 to pay taxes. He returned $220,000 to Matthew Piercy. Hardly the conduct that demonstrates that the Neubauers knew they were wrongfully injured. That was substantially earlier though, right? It is in August of 2019. We're talking about four months to get to January of 2020. So I would not consider that substantially different. And, in fact, the facts also demonstrate, which the trial court did not deal with, did not confront, the fact is in January of 2020, the month in which the Neubauers are alleged or claimed by the court to have known or reasonably should have known that they were wrongfully injured. They received a balance statement from the fund that Matthew Piercy was managing that showed a net asset value of the fund of $7 million. Well, let me ask you this then. When did they know? We believe that the earliest they knew was on March 19, 2020. Subpoena date? I'm sorry? The subpoena date? The subpoena date. I think that's a reasonable point where a court could say when you receive a subpoena that asks for documents and demonstrates that there's a criminal investigation ongoing into your investment advisor, you then have to take action. You then have to inquire. You have to make some sort of reasonable ability to find out whether you were, in fact, injured or not. It certainly doesn't demonstrate absolutely the injury. And let me take a sidestep here. In the securities business, this is also trickier because you can lose money with your investment advisor where there was no wrongful conduct. If the investment advisor simply makes a wrong guess or a wrong estimate or his research is inconclusive and invests your money in the wrong way, you can lose money, and there's no wrongful conduct on the part of that investment advisor. So the quandary that the Neubauers were having in January of 2020 was, in fact, that there was sloppy bookkeeping and the fact that these payments were coming some much more than they wanted. One payment was coming late. So they began to get concerned, for sure. There was concern. There was also a cessation of receiving statements from that particular fund.  Although they did get statements from another fund. Well, there was a complicated layering here of responsibilities. There was Middling Trust, who was also sending out statements for the same account and the same fund. So they did receive the statements from them. But Matthew Casey from the Zara High Yield Fund was late in producing statements at the end of 2019. But it was the court's permission. May I read briefly from it? Would you tell me the pages you're reading? Yes, of course. The record page is C398. This answer from Mr. Neubauer, which I'm reading, immediately follows the paragraph. You may proceed. Thank you, Your Honor. Immediately succeeds the paragraph which the trial court quoted at length and Mr. Meyer quoted repeatedly about the words charade and scam. Mr. Meyer asks, so what led you to conclude, at least be suspicious by January of 2020, that Matt had scammed you? Answer, there were a number of things. If you go back to our March of 2019, we ended up with a double payment. His bookkeeping was terrible and very sloppy. We ended up with a double payment on our monthly living expenses. Then in July, I believe we ended up with $60,000 in our account versus $30,000 I needed for my quarterly tax payment. The following month, that would be August, when I was trying to set up my tax payment for September, they sent me $250,000 by mistake, which I returned $220,000 of it to them. But it became very obvious as we progressed through the year that his bookkeeping was very sloppy, which was a big red flag to me. And then you couple that with the fact that the last statement I got through Family Wealth Legacy was in July of 2019. So it's clear from his answer, what made you suspicious, that's what made him suspicious. Not that he was wrongfully injured, not that he had actually lost money, quite the opposite. In 2019, he was receiving much more money than he asked for and much more money than he wanted. So the notion that somehow these two words, scam and charade, forced the court to conclude that they knew or reasonably should have known that they were wrongfully injured, I think was an error. I know my time is up, and I appreciate the court's patience. Let me... Any other questions? I have no questions, sir. Margaret? I actually did have a question or two, yes. Do you want to finish your sentence? No, Your Honor, I'd rather answer your question. Well, if we deem that they knew or should have known at that point that's described in the deposition, there was still 10 months left on the legal malpractice statute, correct? Well, they had two years from when they knew they had an injury. And that's, of course, not key to the legal malpractice. The legal malpractice occurred back in December of 2018. But the date that they would have had to file was two years either from January 2020 or two years, as we contend, from March 19th. So it's a difference of two months. And we did file on March 14th of 2022, which we believe was within a week of the statute of limitations. So we would have had two years from either date, January 2020 or March 2020. Normally, a malpractice claim is based upon the concept that but for the negligence or malpractice of the lawyer, the client would not, or the plaintiff, would not have been injured. And so when you mentioned the claim of nondisclosure is a legal malpractice, my question to you then is how does but for relate to the nondisclosure vis-a-vis the wrongful appropriation or expropriation by Matthew? That's, of course, a central question in the merits of the case. And yes, we would have to convince a jury that but for that failure to disclose either, and there are actually several disclosures that Matthew, that I'm sorry, Rodney failed to make, but for the failure to disclose that they had a cause of action, if they were not able to recover their monies through a demand to Matthew Piercy, they would have recovered all the money that they had just given to him weeks before. So if they had filed a claim for rescission, we believe that there was sufficient monies, and we have a factual basis to believe that because Matthew Piercy was in effect producing more money in 2019 than the Neubauers requested, much more money, and that they would have been successful in that rescission claim. And other failures to disclose, by the way, Your Honor, were that Matthew Piercy, that Rodney Piercy knew that Matthew Piercy was not a licensed investment advisor, so that these investments were in fact illegally sold. And that the Neubauers have known that there was a criminal investigation ongoing for securities fraud, they would have also demanded and filed this rescission claim. They knew none of that. You've answered my but for question, Mike. The other implication is whether or not the failure to disclose was an act that would continue your client's ignorance about the fact that they were injured. So there's a duality here in the sense that one may relate to relief based upon a cause of action. The other is the implications of whether or not your client was given notice or should have been given notice that for whatever reason did not implicate the statute of limitations. Have you made that argument in the record relative to the nondisclosure also having effect on the statute of limitations and the knowledge of your client as to when the injury arose? I think, I hope I'm answering your question. Please tell me if I'm not, because I want to. But I believe that's where the equitable estoppel plays in, Your Honor. That is, Rodney Piercy should not be permitted to use the statute of limitations to have these claims dismissed where he made failures to disclose that in fact made it more difficult for them to file any claim, let alone a claim against Matthew Piercy, but also a claim against Rodney Piercy. But if your client, if the trial court was correct in granting summary judgment on the basis that based upon the deposition that your client was aware that, or your clients were aware that they were injured, then what relevance or materiality does the nondisclosure have for purposes of tolling the running of the statute of limitations? I don't think that it tolls it, Your Honor. I think what has happened here is that the cause of action, and I know it's a little intertwined, but the cause of action is against Rodney Piercy for failing to live up to the standard of care for Illinois lawyers who are fiduciaries who are required to disclose certain information for the benefit of their clients. That's a mouthful that I think covers what we are alleging in the complaint. That's the cause of action that we have now had dismissed. It has nothing to do with Matthew Piercy. He was an actor, certainly a third-party actor that caused the Neubauer's damage. But that's not the damage that they have to, and that is the damage which the court, in fact, looked to the damage caused by Matthew to determine whether they, in fact, were wrongfully injured. And the reason the courts can do that is because the appellate courts in Illinois have said it doesn't matter if you know whether the damage, the wrongful damage, was caused by your lawyer or by somebody else. If you have suffered a damage, wrongful damage, the statute of limitations, when you're suing a lawyer, starts to run then. And it took me a while to get my head around that, I have to confess. But that is clearly the law in Illinois. I'm not asking you to change the law or strike it down. That is the interpretation of the statute of limitations section against lawyers. And I'm not familiar with other causes of action, but I think lawyers get an extra layer of protection, I would say, because it does not run when you know the lawyer wronged you. It starts to run when anyone in the world injured you, because that puts you on notice that you ought to start looking around to file a claim and maybe file a claim against your lawyer. My concern is that in order to sustain the estoppel, that you need to show that fraudulent concealment, if you will, continue through the limitations period. And if, despite the allegation sufficient to muster past a motion to dismiss, if the allegation is that something was fraudulently concealed by my lawyer, who did not tell me of a cause of action of which he knew or should have known, that that does not save you or extend the statute of limitations if within the limitations period. I just want to put it out there, because then I want you to respond to it. You do want me to respond? Oh, yeah. Oh, yeah. But I want to put it out first. I'm sorry. That the estoppel needs to occur all through the limitations period. And if they get notice within sufficient time to bring the cause of action, and some of the cases vary on eight, ten months, I don't know what the outer edge is, but if there's a reasonable period of time within which to bring the cause of action, then the fact that there was an alleged concealment will not save the plaintiffs. That's what I'm concerned about here. I would disagree a little bit on your analysis, Your Honor. There's a difference between fraudulent concealment and equitable estoppel. We are not alleging. I think the cases are the same, though, that estoppel will not save you. I don't believe so. I believe, and I'm relying on Jackson Jordan in this regard, it's an Illinois Supreme Court case, that in fact the estoppel elements are different than the fraudulent concealment elements. They really are identical to the elements for misrepresentation. For example, a negligent misrepresentation case with one added element, and that is that the party who was misrepresented to basically is prejudiced by the misrepresentation. But we are asking that Rodney Piercy not be allowed to assert the statute of limitations, not to toll it. We're not asking him to toll it. We're saying it is unfair, and the equities require that he not be allowed to raise the statute of limitations as a defense. And would that ever end? Let's talk about a different cause of action, not what happened here, but assume that conduct for which counsel could be estopped occurred. Is there ever then a period of limitations or no? I would argue that probably at that point you would look to the statute of repose, which basically sets a six-year, in this case, in this statute, a six-year limitation on bringing a case against a lawyer regardless when it accrued, and I think that's probably what the answer would be, even though it's an excellent question. But I think that the estoppel of asserting the statute of limitations defense is obviously on a case-by-case basis, and in this case, because of the conduct of Rodney Piercy, by failing to make these disclosures, and the case law is very clear that silence is the same thing, or an omission is the same thing. In the case of a fiduciary. Of a fiduciary is the same thing as an active, forceful misrepresentation or representation. So I think here Rodney Piercy simply has to go to trial on the merits. We're not saying that anything you are doing in this case will have any impact on the merits of the case. Either he failed to live up to the standard of care, or he didn't, or he's immune. He'll make all kinds of arguments that he did act appropriately, and he has an expert and we have an expert, and there will be a battle of that. What I'm asking this court is, do not take these two words of Richard Neubauer at a deposition and say that indicates what he knew or reasonably should have known about a wrongful injury. I think it's clear, if you credit Mr. Neubauer with his continuing answer to Mr. Myers' questions, that what he was talking about was not an injury, but was sloppy bookkeeping and poor conduct on the part of Matthew Piercy. I don't believe they thought, even though he made a request for half his money, that the record also indicates that he made an agreement after January 2020 with Matthew Piercy, that he would leave $900,000 with Matthew Piercy if he would return $500,000 by March to pay taxes. Now, that didn't happen, and that's exactly the time in which he received this subpoena, and I believe that is the time in which he knew or reasonably should have known that he suffered an injury from Matthew Piercy because of this investigation. What was the date that the money was to be returned in March? I believe it was before March 15. Any other questions? No, sir. No. Thank you. You'll have an opportunity to make the public comment. Thank you very much, Your Honors. Mr. Meyer, you may proceed. Thank you, Your Honor. May it please the Court. My name is Daniel Meyer. I represent Rodney Piercy and Piercy & Associates. I ask that you affirm the subpoena.  I affirm the Circuit Court's summary judgment grant because, in my view, the Circuit Court properly determined that the cause of action against my clients occurred in January 2020 and that the estoppel doctrine does not apply. Before I get into my previously planned remarks, there are a few things that I'd like to address that the Court just addressed with Mr. Shulman. One, Justice Jorgensen asked whether the disclosure by Rodney Piercy, the hypothetical disclosure by Rodney Piercy to the appellants in December 2018, would have been a violation of the attorney-client privilege between Mr. Piercy and Matt Piercy. The answer to that question is, again, in my view, and this is the subject of the merits of the case and expert testimony in the case, but yes, it absolutely would have been because there was an attorney-client communication and under Rule 1.6 of the Rules of Professional Conduct, it could not have been disclosed under any circumstances to the new dollars. But don't the plaintiffs also allege that he had an irreconcilable conflict at that moment? Once he knew these people were in this fund where he knew there was money missing and the Feds investigating, at that point, he had a conflict. They allege that he had a conflict. They allege that. Yes, they do allege that he had a conflict. Neither me nor my expert agree that that was a conflict, given the separate, the attorney-client relationship between Mr. Piercy and his son related to a criminal investigation, whereas the attorney-client relationship between Mr. Piercy and the new dollars related to estate planning. So there was no conflict inherent in that. Again, it's a merit-based issue that ultimately would have been decided by the jury had the case been timely filed. There was also the question of the waiver came up during Mr. Shulman's response to Justice Jorgensen. He said that Mr. Piercy waived that by giving deposition testimony in a later case. That's all very well and true, but that deposition testimony was given in, I believe, May or June of 2022, which postdates the indictment by about a year and a half. And at that point in time, the fact of the investigation, which is all Mr. Piercy testified to during that deposition, was no longer privileged. It was public information. Not only had the indictment been filed into the court record, it was splashed all over the front page of the New York Times the day after the indictment was filed. So I wanted to address that issue because Justice Jorgensen raised it. I also wanted to address Mr. Shulman's quoting of Mr. Neubauer's deposition testimony in response to my second question. The second question was, so what led you to conclude, or at least be suspicious? Could you give us that page? I'm sorry. This is back on C398 and 99.  Thank you. Forgive me, please. That's okay. So my question was, so what led you to conclude, or at least be suspicious, by January of 2020 that Matt had schemed? Mr. Shulman read part of Mr. Neubauer's answer to that question, but he left off last, let's call it three paragraphs of the answer. I'm not going to read the third to last, but I am going to read the last sentence of the answer, Mr. Neubauer's answer. You start adding it all together, and you can see why I was very suspicious. That's the important part of that answer. One other point I want to make, or not even a point, it's a correction, and it's my own. If I'm suspicious, is that an injury? Suspicion isn't an injury, but when you look at the case law, interpreting section 214.3b, it says that the statute of limitation begins to run when the client knew or should have known of, one, an injury, and, two, that it was wrongfully caused. So I think your question might go to the wrongfully caused. When does he know or should have known of an injury? Does he know because it's bad bookkeeping, it's sloppy, I'm not getting the right amounts, I'm not getting statements when I'm supposed to be getting them? Did I just pick a guy who doesn't have very good administrative staff, or have I been injured? You've been injured under these facts, and the reason you've been injured under these facts is because in November of 2018, you gave this gentleman $1.4 million of your money.  And in January of 2020, pardon me, January of 2020, you have concluded, based on all of those things that your honor just mentioned, plus not getting some of the payments that they were supposed to get on a monthly basis, that this is a charade and a scam. There's no innocent construction of those words. The circuit court correctly determined that, and that was one of the statements from the circuit court. There's no innocent way to say that you've been scammed or a victim of a charade. Both of those things involve deceit, like trickery, and they amount to fraud. Your argument is they imply wrongfulness. Pardon? Your argument is that it implies wrongfulness. Respectfully, I think it's actually more than an implication. I think explicit in those terms is wrongfulness, because explicit in those terms is deceit, and deceit is wrong. Deceiving somebody is wrong. So to your question, Justice Jorgensen, the New Dallars knew in January of 2020 that they had been the victims of a charade, of a scam, of deceit, of fraud, of trickery. They admit that. They also knew in January of 2020 that they had already given this gentleman $1.4 million. May I ask, just to kind of follow up, though, where were those missed payments? I believe it was one missed payment either in September or maybe it was October, and then I believe the December payment was also of 2019. Pardon me. And I believe the December 2019 payment was not made. It was skipped. So it's not just sloppy bookkeeping. It's not just getting more money than you ask for. It's not getting some of the money you were supposed to get. Just so I'm clear, according to you, it's September and December payments were missed. December, absolutely. I need to be soft on the September because I just don't remember. I know there were two missed payments. I just don't remember the month of the first missed payment. But it was the fall of 2019. I believe it was fall of 2019 or the latter half of 2019. Okay. And the skipped payment you said was January of 20? December of 2019. I believe that payment was not made. December, my mistake. And then you also have an additional factor which wasn't fleshed out today. Midland, this intermediary, would send out quarterly statements. And Family Wealth Legacy was to send out monthly statements. The Family Wealth Legacy statements stopped altogether as of July 2019. There were no statements after that. I believe Mr. Shulman said that they were late in making the statements. They were late. They still haven't been made as of today. But as it relates to the Midland statements, the last two Midland statements, one I believe from September and the other one from late December, showed the exact same balance in the account to the penny. I think we can all know and use common sense to know that an investment account over the course of three months is not going to have the same amount in it to the penny. Even the slightest fluctuation in the market is going to change at least the penny. But there was no change. And there was no statements coming from Family Wealth Legacy at all. So it's not just sloppy bookkeeping. It's missed payments. It's overpayments. It's account statements that don't make any sense in the real world. And that's what led Mr. Neubauer to have the suspicions that he had, that he'd been scammed and a victim of a charade. And he knew that in January 2020. The injury he also knew about, again getting back to Justice Jorgensen's point, because they had given him money, $1.4 million, in November 2018. He knew in January of 2020. They knew in January of 2020 that that money, or at least some of it, was lost. And we see that when Mr. Neubauer talks about his plan. Once he realizes that he's been scammed. I agree with you. He talks about it's better to get half than none. Yes. Well, for $500,000, but yes. I mean, aren't we putting an awful lot of emphasis on semantics and word choice here? I mean, I know it's our business as lawyers. We're all about words and how things are phrased, and words have meaning. But he calls it a sham and a charade. But have I been injured by that charade? When you realize that you're the victim of a scam, and you've got $1.4 million sitting out there, and you come up with a plan that says, I'm going to try to get $500,000 back. I'm not going to ask for all of it. Because I don't want to spook Matthew Piercy. I want him to think that we're still partnering. But I don't ask for $500,000, because $500,000 is better than nothing. And the $500,000 was to be sent back by March 15th. Well, I think that's what Mr. Neubauer proposed to Matthew. Matthew never responds to that or agreed to it. Right, but that was the overture. I believe that was an overture made at some point. Give me $500,000 by such and such a date, and I think Mr. Shulman just said March 15th. So why was it my injury then when I don't receive the money by that date? Because at that point, Mr. Neubauer and the Neubauers, they recognized that they were probably not getting anything back. So what they tried to do was call back $500,000, which suggests that they recognized the loss. We're the victims of a scam. We gave $1.4 million to a fraudster. We're not getting that back, but we're going to try to do something here. We're going to try to lull him into a sense of complacency. Please let me digress a moment. I am not denigrating the Neubauers for coming up with a plan. I appreciate that. They were in a bad spot. But they did come up with a plan, and the plan was to try to ameliorate their losses by asking and demanding $500,000. That shows their state of mind in January of 2020. I've been scammed. My $1.4 is gone. I'm going to try to get a little bit of it back. That's knowledge of wrongful conduct, and it's the injury. And to your question, Justice Jorgensen, is it semantics? I kind of look at it a little bit differently, and let me find the case site for you, but I believe it's Bromo. I'm not finding it immediately, and I don't want to slow the court up. Oh, no, it's Dancort. The Dancort case talks about what wrongful cause means, and it says that that term is used in the discussion of the sketch limitations. It is a generic term. It's used generally. And it's used generally because we don't want the term wrongful cause to be equated to a cause of action. And the reason we don't want that to be is because the ordinary layperson, and as intelligent as they are, the Mubauer's are ordinary laypeople. The ordinary layperson doesn't know what a cause of action is. So we use that term generically, wrongful cause. And so I understand your point and your question about semantics. I think it's actually the reverse. It's less about semantics. I'm not saying that Mr. Mubauer said I had a claim to make or I had a cause of action to make. It's much broader than that. It's looser than that. He said I've been the victim of a scam, or pardon me, well, yeah, of a scam and of a charade. And that is wrongful conduct. It's wrongful conduct as the layperson understands those words. Because a scam and a charade are the same thing. They're the same thing as trickery. They involve deceit, which is fraud. Carlson v. Fish, the 2015 appellate court opinion, has several parallels to this case. And it's a remarkable case in that sense. And Carlson was essentially a shareholder fight. And by the way, there's two Carlsons. One followed the other. They're kind of related, but they actually come out of different circuit court proceedings. So I'm referring to the 2015 appellate court decision. So Mr. Carlson was, he had two business partners in an option trading firm. And they weren't getting along. They were freezing him out. He files a lawsuit. They enter into a settlement agreement. And very soon after they enter into the settlement agreement, he starts to suspect. He has a suspicion. That's his own work. And it's very similar to Mr. Neubauer's work. He starts to suspect that his former partners had tricked him into the settlement agreement.  Scam, charade, deceit, fraud. It's all the same thing. He then sued his lawyers. But he sued them more than two years after he came to his inclusion. That, or I should say, to the suspicion that he'd been tricked. And the lawyers moved to dismiss on the statute. Trial court granted that motion. The appellate court ended up affirming. And one of Mr. Carlson's arguments was, well, suspicion is not enough. It's got to be more than that under the statute of limitation in the case law interpreting 214.3. And the appellate court said, no, it's not. A suspicion, or it doesn't have to be more than that. A suspicion is enough to start the triggering or the commencement of the statute of limitations. The Janowski case similarly says the same thing. That when you have a suspicion that you've been harmed by wrongful conduct, the statute begins to run. Carlson, and to a lesser degree Janowski, but Carlson is very similar to this case in that respect. Carlson was arguing, I had a suspicion that I'd been tricked. But that's not enough to run the statute, to start the commencement of the statute. The New Bowers are arguing the same thing here. They had a suspicion that they were tricked, victims of a charade and of a scam. And that's not enough to run the statute. There's got to be more. Carlson v. Fish and Janowski said, no, there doesn't have to be more. That's enough. You had the suspicion in January of 2020 that you'd been harmed. And you had to do something, at least as it relates to my client, within two years of that date. I'm sorry. If you attempt to mitigate an injury, you would have to inherently believe you had been injured. Would that be a true statement? Yes. I would agree with that. And I think that fits into what the New Bowers' plan was in January 2020. They knew they were victims of a scam, and they attempted to mitigate the effects of that scam, which was the loss of their $1.4 million. And their plan was, let's try to get $500,000 back. I think that's exactly what that was. What about the estoppel? I see in your brief you're arguing that the defendant didn't make an affirmative statement, but that's not necessary when it's a fiduciary, correct? Right. I think in the context of the statute of limitations, it is. I agree. Fundamentally, I agree, but I also agree because it's the law of DELUNA that when there is a fiduciary relationship— Which there is here as a matter of law. Right. The fiduciary has an obligation to speak. But that is the New Bowers' case. So going back on a fraudulent concealment or estoppel could be based on failure to speak. Do you agree with that? I don't know if I agree with that because those are not the facts of DELUNA, and that's not what DELUNA was decided on. Remember, the facts of DELUNA was—the underlying case was a medical malpractice case. The lawyers went out and filed a complaint, the medical malpractice complaint, without a 622 affidavit. And they did that on purpose to test the constitutionality of 622. They did that without consulting the clients or getting the clients' informed consent. And there was active misrepresentation. Your case isn't going well. Your case is going very well. Don't worry, people. I get that. But there is this principle of law that a fiduciary has a duty to speak, and the cases say that fraudulent concealment in the case of a fiduciary can result from silence. But you dispute that. But I'm going to ask you this. Let's assume silence where there's a fiduciary could be enough. Then in this case, does it matter that there was time left? If January 20 is the date of knowledge, there was time left on the statute of limitations. Does that affect things? It absolutely matters. In fact, my argument is that there's three reasons, all independent of each other, why the estoppel principles don't apply. And to hit a point you raised earlier with Mr. Shulman very quickly, there is a doctrinal difference between estoppel and fraudulent concealment. The elements are different. But I think the point that Your Honor was trying to make was that, irrespective of the proofs that are needed to establish each, the existence of each is mooted when there is sufficient time left on the statute of limitation in which to file the lawsuit. And here, that was absolutely the case. In your typical estoppel case, when you're talking about the statute of limitations, the defendant says, well, the cause of action occurred on such and such a date, and therefore the statute of limitation is X. And the plaintiff comes in and says, well, no, because I was not aware of the facts that gave rise to the cause of action, due to your conduct, Mr. Lawyer, or Ms. Lawyer, or your words, I get the benefit of estoppel because your calculation doesn't give me enough time to file this lawsuit. The way that we have calculated the statute of limitation here, and the way that the circuit court applied the statute of limitation here, there was not only ample time, there was the full two years. This is not a situation where my clients are asserting that the statute of limitation began to run in 2018, just by way of example. Now, my clients assert, and the circuit court agreed, that the statute of limitations began to run in January of 2020. It was only at that point that we start calculating the two-year time period. So they had the full two years from then to file the lawsuit. And there was no, at that point, no longer anything that they didn't know. They knew they had been scammed. They knew that they were victims of a charade by January of 2020. So they got the benefit of the two years. So that's a second reason, in addition to the act of representation, why we don't believe the estoppel doctrine applies to preclude the statute of limitations defense. And the other third grounds under estoppel, and why I suggest it doesn't apply, is that the grounds, or I should say the facts that support the fiduciary duty claim against my clients, are the same facts that support the estoppel argument. And the law says no. When the same facts support the cause of action, they cannot be used to also support estoppel. And that is, I believe, also a problem in other cases. And I don't want to dwell on this too long, because the plaintiffs admit this. Your time is up, and I think you've answered your question. Are there any other questions? I'm sorry, I didn't hear the buzzer. No. Forgive me. The buzzer was about 12 minutes ago. I was so intent on answering questions. I was so intent on listening to you, too. Forgive me. No problem. The question I have, though, is are there any more questions? No, sir. Thank you, Judge. Okay. I have no further questions. Thank you. Thank you for your time. And please do forgive me for not halting when I should have heard the buzzer. The purpose for oral argument is for us to have our questions answered. So if we have questions, we'll stay here as long as we need to be. Appreciate it. Thank you. Mr. Shulman, you may proceed. Thank you. This is what happens when you have two windy lawyers, Your Honor. I apologize. I'd say well first. Thank you. Justice Jordan said I want to answer the question about words and why words in this case shouldn't be used to make a dismissal of the claim that the Newbellers have against Rodney Piercy. The Jackson-Jordan case cautions that summary judgment should only be given because it's a drastic remedy and particularly refers to the discovery rule, which has been engrafted, as we all know, onto the statute of limitations provisions against lawyers. And basically it says it's only appropriate in the context of using the discovery rule for injury, for the fact of injury, because that is ordinarily a question of fact for the trier of fact. And this is where the unfairness in this case and the sort of the paradox that the Newbellers are facing is squarely put. The court says summary judgment is only appropriate if the undisputed facts allow for only one conclusion. One conclusion. So the trial court here concluded that Mr. Newbeller's answer of scam and a charade could only have one conclusion, that he knew he was wrongfully injured. I believe that's incorrect and unfair. The consequence of doing this, of dismissing the case, basically a month before it was scheduled for trial, all of the matters had been concluded, no summary judgment was taken on the merits of the case, was now to allow the jury and have the Newbellers to have their day in court to the jury to decide all of the factual questions, which would include, of course, whether their claim was brought timely. And, in fact, it was. And it was brought timely within the two-year period from the time they actually had some basis to know that they were wrongfully injured. I mentioned this earlier, but I want to emphasize this. In this case, there are two things at play that are unusual in a malpractice case. First of all, it involves securities, but not securities advice that the lawyer gave, but rather the fact is, when does a person know they've been injured by their securities advisor, their securities broker, investment advisor? That's not an easy thing to know. And I also want to clarify that there was only one missing payment, monthly payment, and that was the payment in December of 2019, which, in fact, the Newbellers did receive in January. So at the time that the court found that they knew or reasonably should have known that they were wrongfully injured, they had received their monthly distribution, their monthly payment from Family Wealth Legacy. Well, counsel, let me ask you basically the same premise that I posed to your opposing counsel, and that is, if you attempt to mitigate an injury, don't you have to have believed or known that you were injured? That's a great question, and I was going to answer that because you raised it earlier. That was the second thing I was going to say. I actually tried to limit what I say. In this case, no, I don't think that's applicable. First of all, again, it goes to the value of securities and whether securities are something that you can identify, I've been injured, wrongfully injured, by the value going up or down. I think here there was no indication that this was a mitigation. I think this was an attempt to make a distribution, get a distribution, a substantial distribution from Family Wealth Legacy, perhaps to test how quickly and how energetically Matthew Peercy would follow what the demand was. And Matthew Peercy did communicate, and he made that commitment to produce that $500,000 and was going to continue to manage the $900,000. Did they receive the $500,000? They did not. And when did they ostensibly know? Wasn't there a deadline, I guess I'm asking? I think he gave them a deadline for mid-March, and the complaint in this case was filed on March 14th. So the complaint was filed within the two-year period, even taking into account that they were asking and making a demand for additional payments from Matthew Peercy. Matthew Peercy was also a very persuasive fraudster, and I think that has to come into effect here. And that's why a jury needs to hear all of the facts. They need to hear how credible Mr. Neubauer is, and they need to hear the other facts that perhaps suggest that they knew that they were wrongfully injured earlier than March 19th when they received the subpoena. Thank you, Your Honors. I appreciate your patience. I have a question. Your address is in Milwaukee, Wisconsin. Are you licensed to practice in Wisconsin and in Illinois? I am. Thank you.